588 A.2d 352

**Joseph T. DURHAM, et al.**

v.

**Ralph Rodney FIELDS.**

**No. 959, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

April 5, 1991.

Certiorari Denied Aug. 15, 1991.

Burton H. Levin, Asst. Sol. (Neal M. Janey, City Sol. and Laurice D. Royal, Asst. Sol., on the brief), Baltimore, for appellants.

Barry L. Steelman and Nicholas D. Cowie, Baltimore, for appellee.

Argued before WILNER, C.J., MOYLAN, J., and JOSEPH S. CASULA, Judge, Specially Assigned.

WILNER, Chief Judge.

Until the General Assembly, by 1990 Md.Laws, ch. 220, provided for its takeover by the State, the Community College of Baltimore was an entity owned and operated by the Mayor and City Council of Baltimore. It was governed by a Board of Trustees appointed by the Mayor and City Council. In 1986, Joseph T. Durham was president of the college; Ralph R. Fields served as dean of faculty and provost. In June of that year, Dr. Durham recommended to the Board of Trustees that Dr. Fields' employment be terminated. In August, the Board concurred in that recommendation and formally terminated Dr. Fields' employment.

Aggrieved by that decision and the manner in which it was made, Dr. Fields sued Dr. Durham, the members of the Board of Trustees, and the City, in both Federal and State court. Although he lost his Federal case, he was successful in persuading a judge and jury in the Circuit Court for Baltimore City that his removal as a faculty member was improper, and in consequence he was awarded a judgment for $1,750,000. The defendants have appealed.

### Factual Background

Dr. Fields commenced employment with the college in 1967 as Director of General Studies. From 1969 to 1978, he held both a faculty and an administrative position at the

college. He began his faculty rank as an associate professor, becoming a full professor in 1974. He was promoted as well through the administrative ranks, becoming assistant dean of faculty in 1969, associate dean of faculty in 1970, dean of faculty in 1976, and dean of faculty and provost in 1978.

In June, 1970, upon recommendation of the then-president of the college, Dr. Fields received tenure from the Board of Trustees. Under the applicable by-laws of the Board that meant, among other things, that (1) he could be dismissed only by the Board and only for gross insubordination, incompetency, or moral turpitude, (2) if he disputed the charge, he was entitled to a hearing before the Board and the assistance of counsel, and (3) unless the charge was based on moral turpitude, he was entitled to one year's advance notice.

In 1977, a new president, Rafael L. Cortada, was appointed. In part because of a collective bargaining agreement that the college had with a union representing faculty personnel but not administrative officials, Dr. Cortada decided to separate faculty and administrative positions and not to have the same person serve in both capacities. This was reflected in a number of documents, one of which, issued in December, 1980, was entitled "Conditions of Appointment for Administrators and Non–Instructional Personnel." This document applied to the "staff" of the college, defined as those personnel appointed to certain administrative positions "whose primary duties are not in classroom instruction." It is clear, and really not disputed, that the administrative positions held by Dr. Fields fell within the ambit of the new conditions. It also appears that, by then, Dr. Fields was no longer actually teaching any courses at the college but instead devoted his full time to his administrative responsibilities. Indeed, the record indicates that Dr. Fields had not taught any courses since 1972 or 1973.

The conditions set forth in the 1980 document represent, in effect, terms and conditions of employment for adminis-

trative personnel subject to them. The document states, among other things, that an administrative title shall not be held concurrently with professional rank, that administrative contracts shall be for one or three year periods, and that termination prior to expiration of the contract shall be only for "documented failure to achieve a performance rating of 'satisfactory,' 'good cause,' lack of student enrollment, program curtailment, negative impact of performance on the administrative and educational progress of the College, or fiscal exigency." In contrast to the by-laws governing tenured faculty, only 30 days (as opposed to one year) advance notice was required, but a hearing before the Board of Trustees was assured. The only specific reference in this document to "tenure" was the statement:

> " 'Tenure' will not be awarded to or held by administrators who have not fulfilled the residence requirements in teaching, and undergone the evaluation processes required of faculty members for the award of tenure at the Community College of Baltimore."

Dr. Fields had initially been appointed to the position of dean of faculty and provost in 1978 for a three year period. That was extended by letter agreements in 1981 and 1984. Under the last of these agreements, which mentioned and incorporated the 1980 Conditions of Appointment, Dr. Fields' appointment ran to June 30, 1987.

In 1985, amid allegations of fiscal and administrative mismanagement, there were a number of changes in the top management of the college. Dr. Cortada left, and in September, Dr. Durham was appointed as interim president; he was formally appointed as president in the spring of 1986. One of the things to which he turned his attention was the evaluation of administrative personnel. Since 1977, the college had in place a written procedure for the periodic evaluation of administrative personnel. It called for an evaluator to evaluate the person's skills, strengths, and opportunities for improvement in working toward the specific performance objectives of his position. Upon completion of the evaluation, the evaluator was to meet with the

person, at a meeting called especially for that purpose, and present him with the evaluation. The person evaluated had five days to file a written response. The evaluator's immediate supervisor was then to review the evaluation and was permitted to make comments.

In February, 1986, Dr. Durham directed that evaluations of administrative personnel be completed by May 15. He designated himself as the evaluator of Dr. Fields and certain other high level officials. No one was designated to review his evaluations of those people. On March 10, he sent a memo to Dr. Fields noting three "areas of concern about your performance." One had to do with "accept[ing] a directive" from another college official that led to the college being closed on September 27, 1985; the second complained of his taking a week's vacation, to which he was entitled, without "reminding" Dr. Durham; and the third was a cryptic reference to "the infamous 'Glenmount Story' " that was not further explained. Dr. Durham warned that "[b]ecause these are serious occurrences, I shall note them in your forthcoming evaluation" but stated that he would "be available to discuss these with you." Dr. Fields claimed that he had a "good meeting" with Dr. Durham following this memo.

Despite his directive that evaluations be completed by May 15, Dr. Durham did not get around to completing his evaluation of Dr. Fields until June 27, 1986. On that day Dr. Durham called Dr. Fields to his office and handed him a written evaluation in which he rated Fields' overall performance as unsatisfactory. He found his "Supervisory/Evaluative Skills" to be "inadequate and unsatisfactory," recounting a number of episodes of what he regarded as substandard performance. He said that he had "no confidence" in Dr. Fields' leadership ability, cited "sloppy" staff work, and opined that he was "ineffective as the chief academic/instructional leader" of the college. He ended the evaluation with the recommendation that Dr. Fields "be replaced" and that his contract not be renewed.

In point of fact, Dr. Durham was recommending more than mere non-renewal of the contract. In a separate letter, he informed Dr. Fields that he intended to recommend to the Board of Trustees that the current contract, which still had a year to run, be terminated. He stated, in relevant part:

"The College policy provides that when an administrator fails to achieve a performance rating of satisfactory, his contract may be terminated with thirty (30) days notice with due process provided, first, by an appeal to the Cabinet, then to the Board of Trustees for decision, if the action of the Cabinet is not satisfactory....

Please consider this letter as my notice to you that I shall recommend the termination of your contract as Dean of the Faculty/Provost, effective July 28, 1986."

At some point, a meeting of the president's Cabinet was scheduled to consider Dr. Fields' protest of this action, but for reasons somewhat in conflict, Dr. Fields decided to forego a hearing before that body and present his case directly to the Board of Trustees. Dr. Fields maintained that he waived the hearing before the Cabinet because he was informed just before the meeting that his attorney would not be allowed to participate, that several members of the Cabinet had recused themselves, and that the matter would be presented to the Board no matter what the Cabinet did. The defendants do not deny those assertions but add that the reason some members recused themselves was because Dr. Fields had gone to see them in advance to persuade them to vote in his favor and they felt uncomfortable.

The Board met on the evening of August 12, 1986. It did not consider whether Dr. Fields had any right to remain as a faculty member but proceeded only upon Dr. Durham's charges of unsatisfactory performance in his administrative positions. Both the Board and Dr. Durham were apparently operating on the assumption that Dr. Fields' employment rights were governed entirely by the 1980 Conditions that

were incorporated into his 1981 and 1984 contracts and that he either had lost any tenure as a faculty member or that such tenure was not an issue in that proceeding.

The record indicates that the Board members were generally familiar with Dr. Durham's complaints against Dr. Fields and that Dr. Durham presented no witnesses other than himself to explain or document those complaints. Most of the hearing was devoted to Dr. Fields' response, which consisted principally of documentary evidence; friendly witnesses, he said, refused to testify on his behalf because of fear. Dr. Fields alleged, with some evidentiary support, that the Board did not, during the hearing, actually examine the various documents he presented but adjourned, immediately after the hearing, to Dr. Durham's office. He claimed to have overheard some of the Board members say to each other that, because it was then very late, the Board would have to reconvene at another time to deliberate. On August 15, 1986, the chairman on the Board, Mr. Jeffers, wrote to Dr. Fields and his attorney:

"Please be advised that the decision of the Board of Trustees sitting as appeal board from the hearing of Tuesday, August 12, 1986 was an affirmation of Dr. Durham's contention that there did and does exist good cause for termination of Dr. R. Rodney Fields as Dean of Faculty/Provost at the Community College of Baltimore.

The Board of Trustees at a subsequent meeting approved and affirmed Dr. Durham's recommendation to terminate Dr. Fields."

By separate letter dated the same day, Dr. Durham notified Dr. Fields that, pursuant to the Board of Trustees decision "regarding good cause to terminate and their subsequent approval of my request to terminate your employment at the College," his employment was terminated effective that day—August 15, 1986. This letter served to sever the entire employment relationship, both as a faculty member and as an administrator. Dr. Fields could not revert to

a teaching status; he was off the payroll.[1]

## Procedural Background

Dr. Fields' initial reaction to this turn of events was to file suit in the United States District Court for the District of Maryland against Dr. Durham, the college, the Board of Trustees, its chairman, and the City. In his amended complaint, he contended that the defendants' actions deprived him of due process of law (Count I), constituted a breach of contract (Count II), amounted to a civil conspiracy (Count III), and constituted both a tortious interference with a contractual relationship (Count IV) and a wrongful discharge (Count V).

On January 29, 1988, the court, through Judge Motz, granted summary judgment for the defendants on Count I and dismissed the other counts. Judge Motz characterized all five claims by Dr. Fields as asserting that "before terminating his employment, defendants did not afford to him procedural rights to which he was entitled under his contract and under the College's rules and regulation." The judge found the due process claim, filed pursuant to 42 U.S.C. § 1983, wanting for two interrelated reasons: first, because Fields did not contend that the defendants' conduct was sanctioned by State law but instead averred that it was in contravention of that law; and second, because there existed under State law adequate post-deprivation remedies. Having thus disposed of the sole Federal claim, the court declined to exercise pendent jurisdiction over the other claims, which were based on State law, noting that Dr. Fields was "free to pursue those claims in state court."

Perceiving Judge Motz to have been in error, Dr. Fields appealed to the U.S. Court of Appeals for the Fourth Circuit which, on September 13, 1988, affirmed. *Fields v. Durham*, 856 F.2d 655 (4th Cir.1988). The appellate court

---

1. Subsequently, during the pendency of this case, the College agreed to rehire Dr. Fields as a faculty member effective September 1, 1990. Dr. Fields accepted the reemployment.

concluded that the due process violations alleged by Fields were random acts, unauthorized by State law, and that, under the principles laid down in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), if he was in fact deprived of a fair and impartial hearing prior to the termination of his employment, "due process is satisfied by the availability of adequate state law remedies which he may pursue in state court." *Fields,* at 657; also 659. Still aggrieved, Dr. Fields petitioned the United States Supreme Court for a writ of *certiorari.*

On January 13, 1989, while the petition for *certiorari* was still pending, Dr. Fields filed this action in the Circuit Court for Baltimore City. The underlying factual averments in his four-count amended complaint were nearly identical to those made in the Federal Court complaint. In Count I, he urged that his dismissal violated his property and liberty interests in both his faculty and administrative positions, and thus contravened his rights under articles 19 and 24 of the Maryland Declaration of Rights, the State law counterparts to the due process clause of the Fourteenth Amendment. Except for the references to the State Constitutional provisions, the averments were virtually identical to those made in Count I of the Federal complaint. Counts II (breach of contract), III (civil conspiracy), and IV (tortious interference with contractual relationships) were also repetitions of those claims as set forth in the Federal court complaint. The only real difference between the two complaints, other than the Constitutional references, was that the State Court complaint did not contain a count for wrongful discharge.

Though similar in averments, the two complaints had very different outcomes. On January 2, 1990, the circuit court granted partial summary judgment in favor of Dr. Fields "on the issues of violation of his due process rights and breach of his contractual rights in connection with his status as a tenured faculty member." In entering this order, the court found as a matter of law that Dr. Fields

had and retained tenure as a member of the college faculty and that, whether the defendants acted properly or improperly in terminating Dr. Fields' status as dean and provost, they acted unconstitutionally and in breach of his contract in terminating his faculty status.

Prior to trial, Dr. Fields dismissed all of his other claims—Counts III and IV and his claims under Counts I and II that the defendants had violated his Constitutional and contractual rights in terminating his status as dean and provost. The case was thus submitted to the jury only on the issue of damages accruing from the two claims upon which the court had granted summary judgment. For the breach of contract, the jury awarded $100,000; as compensatory damages for the violation of Constitutional rights, it awarded $485,642, which the court later reduced to $400,-000; and, as punitive damages for the latter, it awarded $1,250,000—$500,000 against Dr. Durham and $750,000 against the Board of Trustees.

Aghast, the defendants moved for judgment n.o.v. or, in the alternative, for new trial. That motion was denied on March 1, 1990. Four days later, the Supreme Court granted Fields' petition for *certiorari*, vacated the Fourth Circuit decision, and remanded the case to that Court for further consideration in light of *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), a case that the Court had decided a week earlier. On March 7, 1990—two days after the vacation of the Fourth Circuit decision—the defendants filed this appeal, thereby essentially terminating the jurisdiction of the Circuit Court. Finally, on July 19, 1990, the Fourth Circuit Court of Appeals, acting pursuant to the Supreme Court mandate, reconsidered Dr. Fields' appeal in light of *Zinermon v. Burch, supra*, but again affirmed the judgment of the District Court. This time, the Court concluded that the pre-deprivation remedy provided by the State—notice of the charges and hearing before the Cabinet and the Board of Trustees—provided adequate due process of law and that Fields was therefore not denied his Federal Constitutional rights.

*Issues*

The defendants raise three basic issues in this appeal, two of which have some sub-parts. They first contend that the Circuit Court erred in granting summary judgment on Fields' State due process claims because (1) there was no such violation shown and (2) those claims, being identical to those litigated in the Federal case, are barred by *res judicata*. The second complaint is that the court erred in granting summary judgment on the breach of contract claim because that claim rested on the finding that Dr. Fields had faculty tenure status in 1986 and (1) he had no such status or (2) the facts were in dispute as to whether he had such status. The third complaint is that the evidence was legally insufficient to support an award of punitive damages. We shall deal with these questions in the order presented.

*Due Process Claims*

In urging that we find error in the summary judgment entered on the State due process claims, the defendants understandably lay great stress on the judgment entered by the United States District Court, as ultimately affirmed by the Fourth Circuit Court of Appeals. Those Federal decisions, they say, ought to be given at least persuasive, if not preclusive, effect. Dr. Fields, on the other hand, treats them as irrelevant. The Federal case, he says, was a different case decided on different facts and different law.

As we indicated, the Constitutional claims made in the amended complaint before us are nearly identical to those made in the amended complaint filed in the District Court. The underlying factual averments are the same and the nature of the alleged Constitutional deprivation is the same. The appeal in the Federal case was to the due process clause of the Fourteenth Amendment, whereas in the State case it was to Articles 19 and 24 of the Maryland Declaration of Rights. Both of those State provisions, however, have long been equated with the Federal due process clause and have been held to provide the same, but no greater, rights and protection. *See,* as to art. 19, *Matter of Easton,*

*Incompetent*, 214 Md. 176, 187–89, 133 A.2d 441 (1957) and *Attorney General v. Johnson*, 282 Md. 274, 298–99, 385 A.2d 57 (1978); as to art. 24, *see Oursler v. Tawes*, 178 Md. 471, 483, 13 A.2d 763 (1940) and *Lodowski v. State*, 307 Md. 233, 248, 513 A.2d 299 (1986).

 Notwithstanding the similarity of the claims and the Constitutional provisions upon which they are based, we do not regard the Federal decisions as *res judicata*, precluding consideration of the State Constitutional claims in State court. Several reasons can be advanced for this, but the simplest and most telling is that the Federal court declined to exercise its pendent jurisdiction over all State law claims, expressly reserving to Dr. Fields the right to litigate those claims in State court.

The law seems clear that "a refusal to exercise pendent jurisdiction over a state claim following a pretrial dismissal of a federal claim does not bar litigation of state claims in the state court." *Merry v. Coast Community College Dist.*, 97 Cal.App.3d 214, 228, 158 Cal.Rptr. 603 (1979) and cases cited there. More generally, Maryland follows the rule that the dismissal of an action without prejudice, as was the situation with respect to the State law claims in the Federal action, does not preclude a second action on those claims. *Horowitz v. Horowitz*, 175 Md. 16, 199 A. 816 (1938); *Stoewer v. Porcelain Etc. Mfg. Co.*, 199 Md. 146, 85 A.2d 911 (1952).

A finding that this action is not precluded by the doctrine of *res judicata* does not mean that the Federal decisions are of no importance. It simply means that they are not controlling. Dr. Fields asserts that the actual evidence presented to the State court was different, and more compelling, than that presented to the Federal court. The difference centers on certain deposition testimony, affidavits, and answers to interrogatories tending to establish that (1) the faculty tenure that Dr. Fields received in 1970 was never withdrawn, waived, or revoked, (2) to the extent the 1980 Conditions precluded a person from holding both

administrative and faculty rank and, as to administrative personnel subject to them, substituted those Conditions for the conditions and protections emanating from faculty tenure, it was prospective only and did not affect or apply to persons such as Dr. Fields who then enjoyed faculty tenure, and (3) Dr. Durham and the Board knew or should have known that Dr. Fields retained his faculty tenure and could not be dismissed from the faculty except in accord with the conditions of that tenure.

Building upon that base, Dr. Fields contended and put forth evidence to show that neither the June 27 letter nor any other notice from Dr. Durham or the Board informed him that he faced dismissal as a faculty member and that the Board never considered his faculty status or tenure rights before issuing its letter of August 15, 1986. The specific due process transgressions charged against Dr. Durham were that he violated the evaluation procedures in place by failing (1) to complete his evaluation by the May deadline he himself had set, (2) to focus in his evaluation on Dr. Fields' "skills, strengths, and opportunities for improvement," to establish "understandable and reasonable goals," or to provide an opportunity for improvement in performance, (3) to present the evaluation to him at a meeting called "only for that purpose," and (4) to keep the evaluation confidential. The Board, he says, acted without substantial evidence in support of Dr. Durham's allegations, without considering the evidence he submitted in his defense, and without any consideration of his tenure rights.

It is true that much of the specific evidence offered in this case was not before the U.S. District Court, although we see no reason why most, if not all, of it could not have been garnered and presented in that case. It is also true that the State court acted prior to the second decision by the Fourth Circuit, which focused on the quality of the pre-deprivation procedures rather than the availability of post-deprivation procedures. But we are certainly at liberty to consider that decision to the extent that it presents and discusses the current controlling principles of law.

*Zinermon v. Burch, supra,* 110 S.Ct. 975, did not involve the dismissal of a public employee but rather the admission of a patient as a voluntary admittee to a State mental hospital. The patient later claimed that he was not competent to consent to the admission, that the hospital personnel knew or should have known that, and that he was denied due process of law by the State's failure to provide him with the procedural safeguards applicable to an involuntary admission. In that context, the Court revisited some of the principles it had enunciated in earlier cases. From *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) it noted that there were three different kinds of claims that could be encompassed within an action under 42 U.S.C. § 1983 for State action constituting a violation of due process of law: (1) a claim that the State has violated certain specific rights defined in the Bill of Rights and incorporated into the Fourteenth Amendment; (2) a claim based on substantive due process, challenging an action alleged to be arbitrary or wrongful in itself, without regard to whether the procedure leading up to it was fair; and (3) a claim based on unfair procedure—a violation of purely procedural due process. With respect to the first two kinds of claims, it said, the Constitutional violation is complete when the wrongful action is taken, and so an action under § 1983 will lie regardless of any State post-deprivation remedy. The third kind of violation, however, is complete not when the deprivation occurs but when the State fails to provide due process. As to that, the Court said, 110 S.Ct. at 983:

> "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."

As was the case in *Zinermon,* Dr. Fields has pled only the third kind of violation. He presented no evidence to support a violation of either specific Bill of Rights guarantees or of substantive due process but only that the procedures required for his removal as a faculty member were not followed. That was the conclusion reached by Judge Motz and the Fourth Circuit Court of Appeals in reviewing the Federal complaint, and that is our conclusion in reviewing the nearly identical State complaint.

Procedural due process in this context, the *Zinermon* Court recounted, "is a flexible concept that varies with the particular situation." *Id.* 110 S.Ct. at 984. The court must weigh the private interest affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional procedural safeguards, and the burden to the government of providing those additional safeguards. Applying that test, the Court concluded that normally the Constitution requires "some kind of hearing *before* the State deprives a person of liberty or property," but that "[i]n some circumstances ... a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.*

These principles apply as well in cases like the one at bar, where a tenured employee—one who may be dismissed only for cause—claims that his employment was terminated without due process of law. That, of course, is especially clear from the Court's vacation of the Fourth Circuit Court of Appeals' first decision in the *Fields* case and its remand for further consideration in light of *Zinermon. See also Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The *Loudermill* Court stated the governing rule succinctly at 546, 105 S.Ct. at 1495: "The tenured public employee is entitled to oral or written

notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." That is the process that is due.

The Fourth Circuit Court of Appeals applied these principles in its second decision. It noted that the State had indeed prescribed pre-deprivation procedures designed to guard against the risk of improper termination of employment and that those procedures, for both faculty and administrative personnel, required prior notice, a statement of the grounds for dismissal, an opportunity to respond, and the right to appeal the termination. It found that those procedures were not only prescribed but actually provided to Dr. Fields—that he received notice from Dr. Durham that his performance was unsatisfactory, that he had the opportunity to respond to those charges, and that he had a hearing before the Board of Trustees. That process, it held, "more than satisfies the requirements of *Loudermill.*" *Fields v. Durham,* 909 F.2d 94, 98 (1990).

The Court then dealt with the particular argument made in this case—that Dr. Fields had a dual status with the College, as an administrator and as a tenured faculty member, that he therefore had two distinct property interests which warranted two distinct pre-deprivation procedures, and that the defendants provided him with a pre-termination hearing only with respect to his administrative status and provided him no process at all with respect to his faculty status. The Court found the argument flawed, for two reasons. First, it concluded that, in light of the 1980 Conditions, it was unclear whether Fields actually retained faculty tenure after 1981. But even if he did, the Court continued, his property interest was in continued employment generally, not in the right to possess a particular job or perform particular services. Thus, the Court held at 98:

"Due process need not require an employer as a matter of federal law to provide a succession of different pretermination proceedings commensurate with the various positions an employee might have held over the course of an employer-employee relationship. Under the test for the

sufficiency of procedural protection set forth in *Mathews v. Eldridge* [424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)] and its progeny, the institution could permissibly focus here on the adequacy of performance and the appropriateness of termination from the job that Fields was performing for it most recently. The locus of dispute between employer and employee concerned Fields' unsatisfactory performance as Dean of the College. This was the basis of his discharge, and the purpose of the hearing was to ascertain whether this basis was erroneous. It was permissible for the predeprivation process to focus upon it. Thus, as a matter of federal law, Fields received constitutionally adequate predeprivation process with regard to his termination from the job he had been performing for Baltimore Community College since 1978."

That conclusion would probably have been enough to warrant affirmance of the District Court judgment, without consideration of any post-deprivation rights that Dr. Fields may have had. But the Court felt obliged under *Zinermon* and *Loudermill* to examine those remedies as well in determining whether there was a lack of due process. In that regard, the Court took note of these proceedings, involving both tort and breach of contract claims, and held, at 99:

"State court is the proper forum to explore the full nature of the employer-employee relationship, *including the extent to which the state has failed in any way to adhere to employment contract provisions with respect to Fields' faculty status.* Predeprivation procedures are the 'initial check against mistaken decisions,' but they 'need not definitively resolve the propriety of the discharge.' *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495. To shift all the complex congeries of issues implicated by this employer-employee relationship to the predeprivation stage 'would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfac-

**18**

tory employee.' *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495."

(Emphasis added.)

■ As we observed, the evidence in this case was somewhat more elaborate and detailed than was presented to the Federal court, principally on the question of whether, in the minds of various past and present college officials, the 1980 Conditions served to terminate Dr. Fields' faculty tenure. That does not, in our view, destroy the logic or persuasiveness of the Fourth Circuit's analysis of the underlying Constitutional doctrine. The central facts are that for at least thirteen years preceding his termination, Dr. Fields' actual service to the College was solely as an administrator, not a teacher, that it was that actual, exclusive service that Dr. Durham found wanting, and that Dr. Durham's charges and the Board's consideration of them focused on the adequacy of the actual service being rendered by Dr. Fields. No consideration was given to his faculty status because he had not been performing in that status for more than a decade.

We do not suggest here that the ignoring of any tenure rights Dr. Fields may have had as a faculty member left him without any recourse. That is a matter we shall discuss in the next section of this Opinion. We conclude only, as the Fourth Circuit Court of Appeals did in *Sigmon v. Poe,* 564 F.2d 1093, 1096 (4th Cir.1977) and *Kilcoyne v. Morgan,* 664 F.2d 940, 942 (4th Cir.1981) that "[e]very disagreement between a public employee with his employer over ... the terms of his contract does not reach constitutional proportions." [2]

---

**2.** We think the same principle applies to Dr. Fields' complaint that Dr. Durham failed to follow scrupulously the procedures and timetable for evaluating his performance. It is true, as the Supreme Court announced in *U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), that public agencies cannot waive, suspend, or disregard properly adopted rules and regulations so long as they remain in force. That does not mean, however, that every internal policy adopted by an agency or official constitutes such a rule

The trial court did not have the benefit of either *Zinermon* or the Fourth Circuit opinion on remand, but we do. On the record before us, we agree with the conclusions of the Fourth Circuit Court of Appeals and therefore hold that, upon consideration of both the pre- and post-deprivation procedures and remedies afforded to Dr. Fields, there was no Constitutional deprivation under articles 19 or 24 of the Declaration of Rights. We thus find no legal basis for the judgment entered on Count I of the amended complaint and shall reverse it.

### Breach of Contract

The partial summary judgment entered by the court extended not only to the due process claim pled in Count I of the amended complaint but also to one aspect of the breach of contract claim pled in Count II—specifically, that Dr. Fields' discharge from employment included his termination as a faculty member and that such termination was effected in derogation of tenure rights that formed part of his employment contract. The jury awarded damages of $100,000 on that claim.

The defendants argue here, as they did below, that Dr. Fields had no faculty tenure rights in 1986—that the tenure he received in 1970 was lost, or waived, when he signed the 1981 and 1984 administrator contract, which incorporated the 1980 Conditions. At the very least, they argue, the evidence was in dispute as to whether he retained faculty tenure, thereby making summary judgment on that issue

---

or regulation or that every departure from a rule or regulation constitutes a violation of due process. We do not regard the timetable for completing evaluations set by Dr. Durham as a Constitutionally significant regulation. It was not "intended primarily to confer important procedural benefits upon individuals" but was instead merely for "the orderly transaction of business." *See Bd. of Educ. of Baltimore Co. v. Ballard,* 67 Md.App. 235, 240, 507 A.2d 192 (1986). Nor do we read the procedures relied upon by Dr. Fields as necessarily requiring someone to review evaluations made by Dr. Durham, who was the chief executive officer of the College. And we do not perceive the specific departures alleged by Dr. Fields as being substantially prejudicial to him.

inappropriate. On the record before us, we find no merit in either argument.

The defense is based essentially on two provisions in the 1980 Conditions—the statement that "an administrative title shall not be held concurrently with professional rank" and the statement that tenure "will not be awarded to or held by administrators who have not fulfilled the residence requirements in teaching, and undergone the evaluation processes required of faculty members for the award of tenure...." To counter this defense, Dr. Fields produced affidavits, answers to interrogatories, and deposition testimony establishing that (1) the faculty tenure granted in 1970 could only be terminated by the Board of Trustees, (2) the Board had never taken such action, and (3) the 1980 Conditions were not intended by Dr. Cortada, Dr. Fields, or other persons in situations like Dr. Fields to affect any tenure previously granted and that the tenure statement therein was to be entirely prospective in effect. These documents, if not properly contradicted, would compel the conclusion that Dr. Fields indeed retained his faculty tenure and that his dismissal as a faculty member was in contravention of it.

In support of their view of these provisions, and supposedly to contradict the evidence produced by Dr. Fields, the defendants submitted an affidavit from Barbara Faw, then an Executive Assistant to the President of the College, who opined that:

> "My understanding of the 'Conditions', as well as the information obtained from Dr. Cortada was, and is that if one had attained tenure in the classroom, and later became an administrator, and subsequently was terminated as an administrator, one could return to the classroom. However, if one had not attained tenure in the classroom, and one was terminated from an administrative position, one would not normally be placed in a teaching position."

There are a number of obvious deficiencies in this affidavit. Most pronounced is the fact that the assertions in it were declared to be based on Dr. Faw's "knowledge, infor-

mation and belief," rather than on personal knowledge,[3] which alone renders the affidavit nugatory for this purpose. *Fletcher v. Flournoy*, 198 Md. 53, 81 A.2d 232 (1951), *cert. denied*, 343 U.S. 917, 72 S.Ct. 649, 96 L.Ed. 1331 (1952); *White v. Friel*, 210 Md. 274, 123 A.2d 303 (1956). Moreover, Dr. Faw's "understanding" of the Conditions hardly qualifies as a fact, and whatever information she may have received from Dr. Cortada, which is unspecified, is inadmissible hearsay and therefore not usable to create a dispute of material fact for summary judgment purposes. *Gooch v. Maryland Mechanical*, 81 Md.App. 376, 567 A.2d 954 (1990). With the insufficiency of Dr. Faw's affidavit, we find no error in the partial summary judgment granted on the breach of contract claim,[4] and, as the defendants have raised no issue as to the damages portion of that claim, we shall affirm the judgment entered on it.

### *Punitive Damages*

It is clear from the court's instructions to the jury that the issue of punitive damages was submitted solely with respect to the due process claim. There was no basis for an award of punitive damages for the breach of contract. As we shall reverse the judgment entered on Count I for the reasons already recounted, we need not consider further the tenability of the punitive damage verdict.

---

**3.** In the first paragraph of her affidavit, Dr. Faw stated that she had "some personal knowledge of the facts contained [t]herein." At the end, in capitalized type, she states explicitly that "the matters and facts set forth herein are true and correct to the best of my knowledge, information and belief."

**4.** At oral argument, defendants pointed also to certain deposition testimony of Dr. Durham. That testimony certainly presents Dr. Durham's interpretation of the 1980 Conditions but does not address whether those Conditions were intended to apply retrospectively to deprive a person of tenure rights acquired prior to 1980. Indeed, there is uncontradicted evidence that, on at least one prior occasion, the City Solicitor's Office had warned the college that those Conditions did *not* deprive an administrative official of previously acquired faculty tenure.

**22**

JUDGMENT ENTERED ON COUNT I, INCLUDING JUDGMENT FOR PUNITIVE DAMAGES, REVERSED; JUDGMENT ENTERED ON COUNT II AFFIRMED; COSTS TO BE PAID ONE–HALF BY APPELLANTS, ONE–HALF BY APPELLEE.