<u>UNPUBLISHED</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1748

JONATHAN F. BOOTH,

            Plaintiff - Appellant,

      v.

STATE OF MARYLAND, Department of Public Safety and
Correctional Services; JAMES V. PEGUESE, Warden,

            Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Richard D. Bennett, District Judge.
(1:05-cv-01972-RDB)

Argued: May 12, 2009                  Decided: July 21, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and Frederick P.
STAMP, Jr., Senior United States District Judge for the Northern
District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** John B. Stolarz, Baltimore, Maryland, for Appellant.
Michael O'Connor Doyle, OFFICE OF THE ATTORNEY GENERAL OF
MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Douglas
F. Gansler, Attorney General of Maryland, Baltimore, Maryland,
for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff-appellant Jonathan Booth filed suit under 42 U.S.C. § 1983 against his former employer, the State of Maryland's Department of Public Safety and Correctional Services (the "Department"), and James V. Peguese, former Warden at the Maryland House of Correction-Annex ("MHC-X"), asserting a violation of the First Amendment of the United States Constitution, breach of contract, and a violation of his right to religious freedom under Article 36 of the Maryland Declaration of Rights.[1] Thereafter, the plaintiff filed a second action against the Department pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging failure to accommodate his religious briefs, disparate treatment, hostile religious environment, and retaliation. These cases were consolidated. Through several orders entered by the district court, the defendants were granted summary judgment on numerous claims, and the remaining claims were dismissed. For the reasons that follow, we affirm.

I.

Booth is a practicing member of the Rastafarian religion. In accordance with this religious organization's tenets, he

---

[1]This case was removed to the district court.

wears his hair in dreadlocks. In 2002, while employed as a correctional officer with the Department's Division of Pretrial Detention and Services ("Pretrial Detention"), Booth filed suit against the State of Maryland and various Department officials, alleging that the Department violated his rights under the Free Exercise Clause of the First Amendment and Maryland state law for failure to remove his dreadlocks and conform with the Department's grooming policy by disciplining Booth. At the time, the Department's policy provided that only "traditional (i.e. historically acceptable for military/law enforcement uniformed personnel)" hair styles were permissible for male correctional officers. Booth v. Maryland, 327 F.3d 377, 379 (4th Cir. 2003).

The district court granted summary judgment in favor of the Department because the grooming standards were "rationally related to [Pretrial Detention's] legitimate interests in public safety, discipline and espirit de corps." Booth v. Maryland, 207 F. Supp. 2d 395, 398 (D. Md. 2002). This Court reversed. Booth, 327 F.3d at 377. Holding that evidence in the record showed that the Department had previously granted other officers religious exemptions to the hair policy, this Court held that the Department applied a facially neutral policy in an unconstitutional manner. Id. at 381.

3

The parties thereafter entered into a settlement agreement in which the State of Maryland agreed to provide Booth a religious accommodation from its grooming policy, promote him to correctional officer sergeant, not retaliate, remove all disciplinary actions taken against him in connection with his dreadlocks, and transfer him to another facility. The agreement further stated, however, that the Department was not prevented from disciplining Booth if he engaged in misconduct under either the Department's Standards of Conduct or the Code of Maryland Regulations. Thus, pursuant to the settlement agreement, Booth was promoted to correctional officer sergeant and transferred to MHC-X, where Warden Peguese was apprised of Booth's religious exemption.

In July 2004, Booth was promoted to an acting lieutenant position. To be considered for actual promotion, however, an individual was required to take the correctional lieutenant's promotional examination and receive a qualified score. Booth did not take this examination, and in November 2004, he was demoted to correctional sergeant. The parties dispute the reason for Booth's demotion.

Booth contends that subsequent to his demotion, he was advised by other employees and his supervisor, Captain Theresa Dorn, that he was demoted because Warden Peguese disliked his hair. According to Booth, when he met with Warden Peguese to

4

discuss the possibility of being reinstated to the lieutenant position, defendant Peguese stated that "sometimes you can win the battle but lose the war," which the plaintiff understood to mean that although he prevailed in the earlier lawsuit, it did not mean that the Department was going to abide by the religious accommodation. Also during that meeting, Warden Peguese allegedly stated that the Secretary of the Department would never accept Booth as one of her supervisors because he did not wear a short haircut, that this was a "white man's world," and that the Booth had to live in it. J.A. 321. After this meeting, Booth emailed Warden Peguese asking him for advice on choosing between his religious beliefs and his career to which Warden Peguese allegedly responded, "All is well, but the decision is yours." J.A. 850. Booth understood this email as confirmation that he could regain the acting lieutenant position if he removed his dreadlocks.

The defendants assert that Booth was demoted because he performed the position of acting lieutenant unsatisfactorily. Warden Peguese issued a written counseling record to Booth for failing to take necessary corrective actions after noticing trash on some of the tiers while making rounds. After observing Booth giving special privileges to a lower-ranking female officer, Major Warren, another supervisor, notified the plaintiff that he needed to change his behavior. When Booth

5

failed to change his behavior, however, Major Warren recommended that he be removed from the position of acting lieutenant. Captain Dorn also verbally reprimanded Booth for taking long lunches with the female officer and engaging in long conversations and telephone calls with her. Furthermore, Captain Dorn stated that Booth "was careless in his work and inaccurate," and that "most of the time [she] had to take stuff back to him and have him do it over again." J.A. 768. Major Warren also stated that "after a certain time frame . . . you expect him to be a little bit more independent, and he really wasn't showing that." J.A. 936.

In February 2005, Warden Peguese placed MHC-X on lock down status because of violence committed by several inmates. During lock down, inmates are served meals through the food slots in their cell doors and must eat their meals in their cells. On February 28, 2005, Booth was assigned as officer-in-charge on the 11:00 p.m. to 7:00 a.m. shift.

At approximately 1:00 a.m., Correctional Officer I Olatilewa Olowe escorted Nurse Yvonne Henry to deliver medicine to inmate Stefan Bell. Contrary to established procedure, Nurse Henry left medication on the floor of Bell's cell without ensuring that he took it. Later that morning, Booth and Correctional Officer I Deji Akinbobola served the inmates breakfast. Again, contrary to established procedure to keep all

6

cell doors closed and feed inmates through the food slots, Booth ordered the tier control center officer to open five cell doors at a time so that food trays could be placed in the inmates' cells. Booth did not notice anything wrong with Bell when he placed breakfast in the inmate's cell; nor did he observe Bell's medicine on the floor below the food slot. At approximately 8:15 a.m., however, another correctional officer discovered that inmate Bell died sometime during the night.

After an investigation was undertaken, Warden Peguese proposed that Booth be terminated from State service for violating the State Personnel and Pensions Article of the Maryland Annotated Code, the Code of Maryland Regulations, and the Department's Standards of Conduct. Two other officers, in addition to Booth, were found to be at fault in the incident. Officer Akinbobola was terminated for conduct that breached the institution's security. Officer Olowe offered his resignation, which was later accepted. On March 29, 2005, the Secretary affirmed Booth's termination.

Booth appealed his termination and argued that security was not breached because no inmates were released from their cells, and opening cell doors to feed inmates during lock down was allegedly a common practice at MHC-X. An administrative hearing was held before an administrative law judge of the Maryland Office of Administrative Hearings ("OAH"). The administrative

law judge affirmed Booth's termination, concluding that he engaged in conduct "that seriously threaten[ed] the safety of the workplace," breached the security of the institution, and was "unsatisfactory," "negligent," and "insubordinat[e]." J.A. 310, 314-15.

Booth then filed a petition for judicial review of the OAH's decision in the Circuit Court of Baltimore City, which affirmed the decision. The Court of Special Appeals of Maryland affirmed the decision of the Circuit Court for Baltimore City, and the Maryland Court of Appeals denied Booth's petition for writ of certiorari. The OAH also denied Booth's motion for revision and new trial with respect to the OAH decision.

Exhausting his administrative remedies, Booth filed a complaint under 42 U.S.C. § 1983 ("first complaint") in the Circuit Court of Maryland for Baltimore City against the Department and Warden Peguese, alleging a violation of the First Amendment, breach of contract, and a violation of Article 36 of the Maryland Declaration of Rights. Following removal to the federal court for the District of Maryland, the district court granted the defendants' motion to dismiss as to Booth's First Amendment claim, but denied the motion as to the breach of contract and Maryland constitutional claims.

Booth also filed a Title VII claim ("second complaint") alleging failure to accommodate, disparate treatment, hostile

8

religious environment, and retaliation against the Department. The district court consolidated the two cases for review and disposition, and the Department filed a motion to dismiss, or in the alternative, a motion for summary judgment as to the Title VII claim. Thereafter, the district court entered a verbal order dismissing Booth's failure to accommodate and disparate treatment claims of the Title VII complaint. The district court also entered judgment in favor of the defendants as to the breach of contract and Maryland constitutional claims in the first complaint, and the hostile work environment and retaliation claims of the second complaint.

Booth appealed, raising several issues. We address these issues in turn.

## II.

We review de novo a district court's grant of a motion to dismiss. Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). We review a district court's grant of summary judgment de novo. Jennings v. Univ. of N.C., 482 F.3d 686, 694 (4th Cir. 2007) (en banc) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004) (en banc)). We review a denial of leave to amend the complaint for an abuse of discretion. Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002).

9

III.

One issue in this case is that of preclusion, and whether the OAH determination, upheld by the Maryland state court system, precludes Booth from litigating his claims. The defendants argue that the federal courts must give preclusive effect to state court judgments so long as the litigant was provided adequate procedural protections under the Fourteenth Amendment of the United States Constitution and he had a "full and fair opportunity to litigate" the claim in the state proceeding. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 462 (1982). Because Booth was provided ample process in the administrative proceeding, had a "full and fair opportunity to litigate" his claims at the OAH, and could have challenged his termination on the same bases he raises in this action, the defendants assert that he is now barred from re-litigating the legality of his termination in this case.

Booth responds that even if there was a final judicial determination against him, those proceedings are not binding in this action because there is a significant difference between Maryland's Employee Merit System and the federal statutes upon which this current action is based. In support, Booth cites to Ross v. Commc'ns Satellite Corp., 759 F.2d 355 (4th Cir. 1985), which held that an adjudication by the Maryland Employment Security Administration did not preclude a Title VII action

10

because "while a Maryland administrative adjudicator is concerned with forbidden conduct on the part of the employee, Title VII directs the factfinder's attention to a forbidden motive on the part of the employer." Id. at 362 (emphasis included).

We hold that Booth is not barred from litigating his § 1983 and discrimination claims in this Court. The doctrine of collateral estoppel, however, does bar the re-litigation of the misconduct issue. This Court must look to the law of the state where the judgment was entered to determine whether collateral estoppel principles bar litigation in federal court. Kremer, 456 U.S. at 481-82. Collateral estoppel applies in a second action to a determination of fact litigated in the first action, even if the causes of action are different. MPC, Inc. v. Kenny, 367 A.2d 486 (Md. 1977). When there has been a final judgment of a court on the merits in a previous proceeding, collateral estoppel will apply. Institutional Mgmt. v. Cutler Computer, 451 A.2d 1224 (Md. 1982).

There is no indication that Booth raised § 1983 or discrimination claims at his administrative hearing, a fact that the defendants admit, and Booth does not contest. Furthermore, the issues resolved by the OAH concerning whether Booth violated § 11-110(b)(2) of the State Personnel and Pensions Article, as well as COMAR § 17.04.05.04B, are not identical to those § 1983

11

and discrimination claims in this action. As stated in Ross, the former regulations focus on the forbidden conduct of the employee, while the latter statutes direct this Court's attention to the forbidden motive on the part of the employer. 759 F.2d at 362. Thus, the principle of collateral estoppel does not bar Booth from litigating his §1983 and discrimination claims before this Court.

Nevertheless, collateral estoppel does bar the re-litigation of whether Booth's discharge was due to his misconduct. A factual determination was made in the OAH proceedings that Booth engaged in conduct that threatened the safety of the workplace, breached the security of the institution, and was both unsatisfactory and negligent. This led to the administrative law judge's findings that Booth was terminated for misconduct. During both these proceedings and on judicial review, Booth had a "full and fair opportunity" to litigate this misconduct issue. See Harding v. Ramsay, Scarlett & Co., Inc., 599 F. Supp. 180, 184 (D. Md. 1984) ("Because this court has some question about the extent to which the racial discrimination issue was litigated at the administrative hearing . . . the doctrine of collateral estoppel will not bar the litigation of the racial discrimination issue in this federal forum . . . . The doctrine of collateral estoppel, however, does bar the re-litigation of the misconduct issue.").

12

IV.

Booth argues that the district court improperly granted summary judgment in favor of Warden Peguese on his § 1983 claim because Booth's demotion from the acting lieutenant position constituted a violation of the Free Exercise Clause of the First Amendment.[2] The district court held that Warden Peguese was entitled to qualified immunity under the Eleventh Amendment because he did not violate any clearly established constitutional rights.

Title 42, United States Code, Section 1983 provides redress for state action which deprives a citizen of a right, privilege or immunity ensured by the Constitution or law of the United States. See 42 U.S.C. § 1983. Under the doctrine of qualified immunity, government officials are not subject to liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court established a rigid two-step sequence for determining a defendant's entitlement to qualified immunity. "First, a court must decide whether the facts that a plaintiff has alleged . . .

---

[2]Booth does not challenge the dismissal of this claim as to the Department.

13

make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's allege misconduct." Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009) (citing Saucier, 533 U.S. at 201) (internal citations omitted)). Recently, however, the Supreme Court has held that lower courts may decide on a case-by-case basis whether to follow or to vary from the sequence set forth in Saucier. See id. at 818.

That a defendant's conduct is a constitutional violation under clearly established law "does not require that the 'very action in question [have] been previously held unlawful[.]'" Robles v. Prince George's County, 302 F.3d 262, 270 (4th Cir. 2002) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)) (internal citations and quotations omitted). Rather, the proper inquiry is whether the unlawfulness of the conduct would have been apparent to a reasonable officer under the circumstances in light of pre-existing law. Saucier, 533 U.S. at 201-02; Wilson, 526 U.S. at 609. A law is "clearly established" when "the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'" Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998).

14

Here, Booth has failed to identify any authority to support his contention that the right to wear one's hair in conformance with one's religious beliefs is a clearly established constitutional right. Accordingly, this Court concludes that Warden Peguese was entitled to qualified immunity because Booth has not alleged conduct that constitutes a violation of any clearly established right. The district court's granting of summary judgment as to Warden Peguese on this claim must therefore be affirmed.

V.

Booth next argues that the district court erroneously granted summary judgment in favor of the Department on his breach of contract claim.

The settlement agreement provided (1) that Booth would be transferred and promoted; (2) that he would "receive a religious accommodation to [the] dress code policy of the Department"; and (3) that the Department was not prevented "in any way" from disciplining Booth if he engaged in misconduct under either the Department's Standards of Conduct or the Code of Maryland Regulations. J.A. 123-24. That Booth was transferred and promoted is not in dispute. Rather, Booth contests the second two components of the settlement agreement by claiming that: Captain Dorn told him that he was removed from the position of

15

acting lieutenant because of his dreadlocks; the Secretary would never accept him as one of her supervisors; Warden Peguese told him that the Secretary did not want her supervisors wearing anything but short hair cuts; Warden Peguese's email confirmed that Booth had a choice to make about his hair; Booth's understanding of his meeting with Warden Peguese was that he would be reinstated to the acting lieutenant position if he removed his dreadlocks; and Booth offered to wear his hair under a hat.

However, these facts fail to establish that the Department did not provide Booth with a religious accommodation to the dress code policy. Nor do these facts suggest that Booth was terminated for reasons other than misconduct. Several individuals, including Captain Dorn, Warden Peguese, and Major Warren stated that Booth's performance while serving as acting lieutenant was unsatisfactory. Furthermore, the Department has come forward, through the operation of collateral estoppel, discussed above, with sufficient evidence to prove that Booth was terminated for misconduct. See Harding, 599 F. Supp. at 185 ("In effect, the plaintiff, because [he] is collaterally estopped by the state administrative agency and judicial ruling, cannot 'by the process of eliminating the legitimate reason [for his discharge show] that the decision was governed by an illegitimate one.'") (citing Banerjee v. Board of Trustees, 648

16

F.2d 61, 63 (1st Cir. 1981)).  Thus, this Court affirms the district court's holding that there was no breach of the settlement agreement.

VI.

Booth also argues that the district court erred when it dismissed his failure to accommodate claim because it did not take into consideration that he was allegedly demoted from the acting lieutenant position because of his dreadlocks.

To establish a prima facie religious accommodation claim, a plaintiff must establish that: "'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'"  Chalmers v. Talon Co. of Richmond, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985)).

The first two elements are not in dispute in this case. Furthermore, Booth's conclusory statements that he was removed from the acting lieutenant position for refusing to remove his dreadlocks do not defeat the Department's grant of summary judgment on this claim.  See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996) ("[The plaintiff's] own naked opinion, without more, is not enough to establish a

17

prima facie cause of [] discrimination.") (internal citations and quotations omitted). Ample evidence was provided that Booth was demoted from acting lieutenant because of unsatisfactory work performance and for giving preferential treatment to a female subordinate. Thus, we find that the district court did not err in granting summary judgment in favor of the Department on Booth's failure to accommodate claim.

## VII.

Booth argues that the district court erred when it dismissed his disparate treatment claim because other similarly situated employees were not disciplined for opening cell doors during lock down.

To establish a prima facie cause of disparate treatment as to religion, a plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job in a satisfactory manner; and (4) his position remained open or was filled by similarly qualified applicants outside the protected class. Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence that the plaintiff was terminated for a non-discriminatory reason. McDonnell Douglas,

18

411 U.S. at 802. Should the employer demonstrate a non-discriminatory justification for the termination, the burden then shifts back to the employee to show that the asserted justification is merely a pretext. Id. at 803-05.

Booth cannot establish a prima facie case of disparate treatment because sufficient evidence exists that he was performing his job in an unsatisfactory manner. This Court holds, as it has above, that the administrative law judge's determination, upheld by both the Circuit Court for Baltimore City and the Court of Special Appeals, finding Booth's misconduct was the sole reason for termination from employment is established as a matter of law. Thus, through collateral estoppel principles, Booth cannot satisfy the third element in a prima facie case of disparate treatment. We hold, therefore, that the district court did not err in dismissing Booth's disparate treatment claim.

VIII.

Booth next argues that because he provided circumstantial evidence that the Department retaliated against him for wearing dreadlocks in accordance with his religious beliefs, the district court erred in granting the Department's motion for summary judgment on his retaliation claim.

19

A plaintiff must demonstrate the following to establish a prima facie claim of retaliation under Title VII: (1) that he engaged in protected activity; (2) that the employer took an adverse action against him; and (3) that a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Mgmt., 259 F.3d 261, 271 (4th Cir. 2001). "Protected activities fall into two distinct categories: participation or opposition . . . . An employer may not retaliate against an employee participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin v. Metro Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). Opposition activity is defined as "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinion in order to bring attention to an employer's discriminatory activities." Id. at 259.

In this case, Booth cannot prove that there is a causal connection between the engaged protected activity (filing the first lawsuit that resulted in a settlement agreement) and the adverse employment action (his demotion from acting lieutenant). Booth's demotion occurred approximately nine months after his initial lawsuit leading to the settlement agreement. The temporal proximity, thus, is too remote to prove the causal

20

connection alone. See Mitchell v. Sec'y Veterans Affairs, 467 F. Supp. 2d 544, 554 (D.S.C. 2006 ) ("In order to prove a causal connection based on temporal proximity alone, the time between the protected activity and the adverse employment action must be 'very close.'")(emphasis included). Furthermore, there was ample evidence that Booth was demoted from the position of acting lieutenant because of his unsatisfactory work performance. Once again, Booth's conclusory statements that the Department retaliated do not defeat the district court's grant of summary judgment in favor of the Department on this claim. See Evans, 80 F.3d at 959.

## IX.

Booth next argues that the district court erred in entering judgment in favor of the Department on his hostile work environment claim. Particularly, Booth alleges that his demotion from the acting lieutenant position, on the basis that his hair style did not meet the requirements of the position, was sufficiently severe to establish a hostile environment.

To establish a hostile work environment claim under Title VII, a plaintiff must prove the following four elements: (1) unwelcome harassment; (2) that the harassment was based on the plaintiff's religious beliefs; (3) that the harassment was sufficiently severe or pervasive to alter the conditions of

21

employment and create and abusive atmosphere; and (4) that there is some basis for imposing liability on the employer. Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007) (citing Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-184 (4th Cir. 2001)). The plaintiff must show that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65-67 (1986)). In proving the third element, the plaintiff must show that the work environment was both subjectively and objectively hostile. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008). A court must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Id. at 315 (citing Harris, 510 U.S. at 21).

Here, Booth has not established that the conduct was sufficiently severe or pervasive to constitute a hostile work environment based on his religion. While he claims that Warden Peguese "created a situation wherein the Plaintiff's hair style was not acceptable and he could not be promoted without removing

22

his dreadlocks," Booth can only draw this Court's attention to a few isolated instances where his hair was even discussed. J.A. 1174. The first incident allegedly occurred when Warden Peguese told Booth that the Secretary would not allow a lieutenant to wear dreadlocks. The second incident allegedly involves an email response by Warden Peguese that stated, "No thanks your hair has nothing to do with it." J.A. 1175. These incidents are not so "extreme [as] to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Furthermore, after one conversation with Warden Peguese, Booth emailed the Warden that he "enjoy[ed] communicating" and that he "appreciate[d] you allowing me to correspondence [sic] with you." J.A. 1174. This email is certainly not indicative of a hostile work environment under Title VII. Accordingly, because the record lacks evidence that Booth suffered a sufficiently severe or pervasive hostile work environment, we find that the district court properly granted the Department's motion for summary judgment on this claim.

X.

Booth also argues that the district court improperly granted summary judgment for the Department on his claim for violation of Article 36 of the Maryland Declaration of Rights.

23

The district court held that because Booth's claims under the First Amendment to the United States Constitution failed, so too must his claims under the Maryland Declaration of Rights.

Whether Article 36 of the Maryland Declaration of Rights provides a private cause of action is undecided. Baird v. Haith, 724 F. Supp. 367, 371 (D. Md. 1988) ("[T]here is no indication in Maryland law that there is any private right of action for damages under [Article 36]."). Nevertheless, Maryland state courts have proceeded on the basis that even if Article 36 does provide for a private cause of action, Article 36 and the First Amendment of the United States Constitution have the same effect. See e.g. Stover v. Prince George's County, 752 A.2d 686, 695 (Md. App. 2000); Supermarkets Gen. Corp. v. State of Maryland, 409 A.2d 250, 258 (Md. 1979).

"It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." Minnesota v. Nat'l Tea Co., 309 U.S. 551 (1940). Because the Maryland state court system has proceeded to analyze Article 36 and the First Amendment of the United States Constitution under the same requirements, this Court is not in a position now to interpret the Maryland state constitution differently. Thus, for the same reasons discussed in part IV of this opinion, this Court finds that the district court did not err in granting the

24

Department's motion for summary judgment on Booth's Article 36 claim.

XI.

Finally, Booth argues that the district court abused its discretion by denying his motion to amend the complaint to include a count based upon a deprivation of the plaintiff's substantive due process rights under both the United States Constitution and the Maryland Declaration of Rights when Warden Peguese allegedly made false statements at the OAH hearing.

Federal Rule of Civil Procedure 15(a)(1)(A) states, in pertinent part, that "[a] party may amend its pleading once as a matter of course . . . before being served with a responsive pleading." If a party seeks to amend its pleading in all other cases, it may only do so "with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a) grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment." Foman v. Davis, 371 U.S. 178, 182

25

(1962); see also Ward Elec. Serv. v. First Commercial Bank, 819 F.2d 496, 497 (4th Cir. 1978); Gladhill v. Gen. Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984).

This Court notes that a circuit-split remains concerning whether a party's substantive due process rights are violated by an arbitrary, capricious, and pretextual discharge. Compare e.g. Gargiul v. Tompkins, 704 F.2d 661, 668 (2d Cir. 1983) ("If [the plaintiff's] lengthy suspension without pay resulted from an arbitrary or capricious exercise of the Board's power, her due process rights were violated."), and Thompson v. Bass, 616 F.2d 1259, 1267 (5th Cir. 1980) (finding that public employee who had a property interest in continued employment could establish a denial of substantive due process if termination was the result of arbitrary or capricious action), with McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994) ("[I]n non-legislative cases, only procedural due process claims are available to pretextually terminated employees. Thus, we conclude that our prior decisions, which granted pretextually terminated employees section 1983 causes of action premised on substantive due process violations, are contrary to Supreme Court jurisprudence."), and Demesme v. Montgomery County Gov't, 63 F. Supp. 2d 678 (D. Md. 1999) ("Plaintiff alleges that he was terminated in violation of the County's personnel regulations. Accordingly, his claim is not that the County was unable to

26

terminate his employment, but rather that the method used was improper. The Court will treat count one as alleging a procedural due process violation.").

We do not reach the merits of whether Booth's proposed amendment alleges a claim for violation of his substantive or procedural due process rights. Even assuming, without deciding, that a substantive due process right exists, this Court holds that the district court did not abuse its discretion in denying Booth's motion to amend because the amendment would have been futile. Booth alleges that Warden Peguese testified falsely that violence was escalating in MHC-X, that there had been assaults on the staff, and that he did not know the reason for the violence which necessitated the lock down. This alleged false testimony, however, is immaterial to the administrative law judge's finding that the facility was on lock down and that Booth was required to follow lock down procedures in effect at that time, which Booth failed to do. Thus, whether Warden Peguese testified falsely concerning certain facts is inapposite to the OAH and Maryland reviewing courts' determination that Booth's termination was premised on his insubordination. Any amendment to the complaint to assert a due process claim, therefore, would only be futile.

For the same reasons, Booth's putative claims under Article 19 and 24 of the Maryland Declaration of Rights also fail. See

Pickett v. Sears, Roebuck & Co., 775 A.2d 1218, 1224 (Md. 2001) ("This Court has interpreted Article 24 of the Maryland Declaration of Rights and the Due Process clause of the Fourteenth Amendment of the United States Constitution to be in pari material . . ."); Durham v. Fields, 588 A.2d 352, 357 (Md. App. 1991) (Article 19 and 24 "have long been equated with the Federal due process clause and have been held to provide the same, but no greater, rights and protection.").

## XII.

For the foregoing reasons, the judgment of the district court is hereby

AFFIRMED.