806 A.2d 388

**Michael POLLOCK**

**v.**

**PATUXENT INSTITUTION BOARD OF REVIEW.**

**No. 1030, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 3, 2002.

56

58

Mark Gitomer, Owings Mills, for appellant.

Scott S. Oakley, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ADKINS, and JOHN J. BISHOP, JR. (Retired, Specially Assigned), JJ.

ADKINS, Judge.

This appeal is the latest attempt to resolve a long-standing dispute regarding the parole revocation of Michael Pollock, appellant. We must decide whether test results indicating the presence of marijuana in a urine sample allegedly supplied by Pollock should have been excluded due to the failure of staff at Patuxent Institution ("Patuxent") to strictly follow Patuxent's procedures for collecting and documenting urine specimens. After the Court of Appeals remanded for a decision on this question, the Circuit Court for Howard County held that the test results were properly admitted and considered by the Patuxent Institution Board of Review (the "Board"), appellee, both in deciding to revoke Pollock's parole and in later deciding not to renew his expired parole order. We shall affirm the circuit court's decision.

## FACTS AND LEGAL PROCEEDINGS

### The Test

Pollock, who killed a cab driver during an argument, was incarcerated in the Maryland Division of Correction as inmate number **4695** on November 23, 1971. He is serving a life sentence with the possibility of parole for first degree murder, plus two years consecutive for escape.

In April 1980, Pollock was committed to Patuxent as a person eligible for Patuxent programs. He became eligible for parole in December 1985, and was paroled in September 1988. Pollock's most recent parole order was issued in June 1996, with an expiration date of May 1997.

One condition of Pollock's parole was annual urinalysis testing to determine whether he was in compliance with the "no drugs" and "obey all laws" requirements of his parole order. On May 15, 1997, Pollock arrived at Patuxent to submit a urine sample. The specimen associated with Pollock tested positive for marijuana. According to Pollock, what

happened during the collection and testing of this specimen requires exclusion of those test results.

Sgt. A.P. Jones was on duty when Pollock arrived. Jones completed the required "Request for Urinalysis Test" form, certifying that "Micheal [sic] Pollock" had verified his identity by "I.D. card." Jones certified, by signing the form, that Pollock had

> submitted a urine specimen in my presence in a specimen bottle labeled with the inmate's name and number and today's date, and thereafter the inmate handed me the bottle. I thereafter sealed the bottle with evidence tape, and maintained exclusive possession and control of the bottle until I transferred it from my possession and control as indicated below:....
>
> CHAIN–OF–CUSTODY OF SPECIMEN:
>
> From above-named inmate To APJones Date 5–15–97 Time 10:30 AM
>
> From AP Jones To Lock Refrigerator Date 5–15–97 Time 10:33 AM
>
> From Capt. L. Latham To P. Stuffey Date 5–15–97 Time 1:40 PM

Apparently in an attempt to use Pollock's inmate number as the number identifying Pollock's urine specimen, Jones filled in the blank for "number" on that form with **"4697."** (Emphasis added.)

At the same time he obtained Pollock's sample, Jones also completed another required Patuxent form, entitled "Incident Report." Jones completed the "nature of incident" blank with the following handwritten note:

> On the above date and approx. time the above named inmate gave a urine sample for drug testing. The test was administered by this writer and observed by CO D[.] Taylor. The sample was secured in the locked refrigerator in the infirmary....

Jones also used number **4697** on that Incident Report.

A third form completed at the time Pollock submitted his urine sample, was entitled:

## Friends Medical Laboratory

Laboratory Testing Requisition Form

This form identified Patuxent as the "Collection Site" for "7" different specimens, one collected on May 8, another on May 10, and five on May 15, 1997. Listed under the "Specimen Identity" column of this form were handwritten names of seven different inmates. Each name appeared in a separately numbered box. The first line in each box identified the inmate's name in manuscript with a corresponding inmate number. On the second line, appearing right below the manuscript name and inmate number, each inmate signed the form.

"Michael Pollock # 4669" is identified as the fourth specimen, dated "5–15–97," and "collected by A.P. Jones & D. Taylor." (Emphasis added.) In cursive, under his manuscript name and number, Michael Pollock signed his name and correctly identified himself as "# 4695." (Emphasis added.) The form indicates "Capt. L. Latham" "released" the specimens to a courier from Friends Medical Laboratory ("Friends") on "5/15/97" at "1:35 pm." and authorized Friends to test the specimens.

The next day, on May 16, 1997, Friends tested a urine sample received on "05/15/97" that it identified as belonging to "Client: Pollock, Michael **4669**." (Emphasis added.) The results of this test showed that the sample was positive for marijuana. Friends faxed a copy of the test results to Patuxent on May 19, 1997.

A parole revocation warrant was issued immediately. On May 20, Pollock surrendered and was returned to Patuxent. At a May 22 preliminary revocation hearing, Pollock denied using marijuana, but "admitted that he had been briefly in the presence of suspected marijuana smokers[.]" The hearing officer found probable cause for charges that Pollock had violated the terms of his parole, and ordered a parole revocation hearing.

On May 23, at the request of Patuxent, Friends performed a "confirmation re-test," with the same results. The confirmation test report identified the "client" from whom the sample was taken with the same typewritten "Pollock, Michael" that appeared on the original test report, but without the incorrect typewritten inmate number "4669." Instead, handwritten immediately beneath Pollock's name is the following notation: "4695 Ref–P." (Emphasis added.) It is unclear whether the person who added the handwritten inmate number was someone at Friends or at Patuxent.

### Revocation And Non–Renewal

Pollock's parole revocation hearing began on June 19, 1997 and concluded on July 17, 1997. At the hearing, Pollock moved to dismiss the revocation proceedings because he had not received timely notice of the hearing pursuant to Patuxent Institution Regulation ("PIR") 240–19.V.C. Additionally, Pollock moved to exclude the urinalysis reports on the ground that there were violations of the chain of custody procedures and documentation requirements established by Patuxent Institution Directive ("PID") 110–18.[1]

The Board denied both motions. Based on the test results from Friends, it concluded that Pollock had used marijuana in violation of the terms of his parole. "[D]ue to the seriousness of these violations," the Board ruled that Pollock was "no longer eligible for Patuxent programs." As a result, Pollock was transferred to another correctional facility within the DOC to serve the remainder of his sentence.

In August 1997, Pollock appealed the Board's decision to the Circuit Court for Howard County. He argued that the Board violated its own rules by failing to provide timely notification of the revocation hearing and that the urinalysis test results were inadmissible because a chain of custody was never

---

1. Pollock also testified on his own behalf, suggesting that the positive test results might have reflected medication he took for a heart condition, "second-hand smoke" to which he was exposed, or retribution by a friend.

established. Patuxent responded that the issues raised by Pollock were moot because Pollock's parole order had expired before the July 1997 parole revocation hearing, and, alternatively, that there was sufficient evidence to establish a chain of custody for Pollock's specimen.

On April 15, 1998, the circuit court reversed the Board's decision to revoke Pollock's parole, ruling that the Board was late in notifying Pollock of the revocation hearing. The circuit court, however, did not address whether the urinalysis results could be used against Pollock as grounds for revocation of his parole.

As a result of this order, the Attorney General advised Patuxent that Pollock

> must be brought back to the Patuxent Institution and either (1) be declared a "non-eligible person" based on facts other than the parole revocation (although the Board may consider the positive urinalysis that [led] to the revocation); or (2) return the inmate to parole as an eligible person; (3) reinstate the eligible person status, but factually determine that parole is not appropriate through the "annual review" process (rather than in conjunction with a parole revocation).

Patuxent chose the third option. On May 8, 1998, it advised Pollock that, during his appeal of the Board's revocation decision, "your annual review for parole status ... lapsed." Accordingly, an annual parole review hearing was scheduled for May 21, 1998.

In response to this notice, on May 13, 1998, Pollock filed a *habeas corpus* petition in the Circuit Court for Howard County. Shortly thereafter, at the May 21 annual review hearing, the Board relied on the positive urinalysis results in deciding not to renew Pollock's parole. Noting "the legal implications of this case," the Board returned Pollock to Patuxent as "an Eligible Person," where he was "put on [the] drug tier."

On June 2, 1998, the circuit court held a hearing on Pollock's *habeas* petition. A year later, on June 30, 1999, the circuit court denied *habeas* relief because Pollock's parole had

expired, so there was "no parole to which Pollock could be restored."

Pollock appealed that decision to this Court, raising both constitutional and procedural arguments. We affirmed in an unreported decision that adopted the circuit court's rationale. *See Pollock v. Patuxent Inst. Bd. of Review,* No. 1657, Sept. Term 1998, 127 Md.App. 790 (filed June 14, 1999). The Court of Appeals granted *certiorari* to consider whether a Patuxent parolee has a constitutional right to remain on parole until the parole is revoked in accordance with a revocation proceeding that meets "due process" standards. *See Pollock v. Patuxent Inst. Bd. of Review,* 358 Md. 656, 666, 751 A.2d 496 (2000). The Court, however, ultimately declined to decide that question until all of the non-constitutional questions were resolved. *See id.* at 666–67, 751 A.2d 496. It vacated this Court's decision and remanded the *habeas* petition because Pollock had "never obtained judicial review of the use of the May 1997 report of urinalysis either as the basis for the original revocation or as the basis for the May 21, 1998 non-renewal on annual review." *Id.* at 668, 751 A.2d 496.

On remand, by written order dated June 27, 2001, the circuit court found that the testimony and documents presented by the Board

constitute[ ] "substantial evidence" in support of the conclusion that the sample submitted by Mr. Pollock contained marijuana in violation of his conditions of parole. The testimony and exhibits show directly, or support a reasonable inference, that all requirements of . . . PID No. 110–18 concerning the taking, storage, transfer and testing of the sample were complied with, even if one page of the chain of custody [form] was not introduced as an exhibit. The content of that page and the compliance of that document with PID No. 110–18 was testified to by Sgt. A.P. Jones.

The *habeas* court held that both the decision to revoke Pollock's parole and the decision not to renew it were "fully justified" by "the finding that Mr. Pollock's urine sample from May 15, 1997, contained marijuana in violation of his condi-

tions of parole." It is from this decision that Pollock now appeals.

## DISCUSSION

Pollock asserts that the Board's finding that the positive urine specimen was the same urine specimen collected from Pollock on May 15, 1997 was clearly erroneous because that fact "was never established with any reasonable degree of certainty[.]" In addition, he argues that the decision to admit the test results at the revocation hearing and to rely on those results as grounds for revocation and non-renewal "was incorrect as a matter of law" because PID 110–18, entitled "Urinalysis Testing," "sets forth a *mandatory* procedural framework that must be followed when obtaining and testing a Patuxent inmate's urine for illicit drugs."

PID 110–18 does prescribe procedures for collecting and handling urine specimens received from Patuxent inmates.[2] The following portions of this directive are at issue in this case:

2. Each request for a urinalysis test shall be documented by an Incident Report (Appendix A) and a Request for Urinalysis Test (Appendix D)....

4. The urine specimen shall be collected from the inmate as follows: ...

 c. Staff shall hand to the inmate the specimen bottle, *pre-labeled with the inmate's name, number, and date. This information shall be handwritten. The inmate shall be asked to acknowledge that information on the label is correct.... The bottle number shall be noted on the Incident Report Form (Appendix A).*

 d. When the inmate has handed the filled bottle back to staff, staff shall ensure that the bottle is tightly capped, and then shall properly secure a piece of

---

**2.** The term "inmate" is defined to include parolees. *See* Patuxent Institution Directive 110–18.IV.b.

"Evidence Tape" over the cap and to the sides of the bottle....

f. The collection of the urine specimen ... shall be documented on the Incident Report.

g. The original copy of the Medical Laboratory Chain of Custody Form shall be retained until the specimens are picked up for testing. The original copy shall be signed by and released to the Medical Laboratory courier. *The duplicate copy shall be sent to the Major's Office.*

5. The urine specimen shall be handled and processed as follows:

a. The number of staff handling the specimen should be minimized. All items shall then be placed in the refrigerator in the Major's area. *At all times, the specimen should be in the actual possession and control of staff or secured in a manner which does not compromise the integrity of the chain of custody.* ... (Emphasis added.)

Pollock claims that "Patuxent disregarded a number of its own mandatory rules relating to establishing a proper chain of custody," which required exclusion of the test results as a matter of law. Specifically, he points to four "violations" that he contends rendered the Board's decision to admit the lab test results and to rely on them in not renewing his parole "arbitrary and capricious."

1. Jones, the collecting officer, either used no identification number on the specimen bottle from Pollock, or used the wrong inmate number on it, in violation of PID 110–18.VI.A.4.c.

2. Instead of placing the evidence tape over Pollock's specimen bottle himself, Jones allowed Pollock to do so, in violation of PID 110–18.VI.A.4.d.

3. Jones and Corrections Officer Taylor, who was the other staff member present when Pollock submitted his urine specimen, did not document that Taylor actually han-

dled the specimen bottle, in violation of PID 110–18.-VI.A.4.

4. Patuxent failed to produce a signed copy of the Medical Laboratory Chain of Custody Form, in violation of PID 110–18.A.4.g.

### Standard of Review

Our role in reviewing an administrative decision is the same as that of the circuit court. *See Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 449, 800 A.2d 768 (2002). We must reevaluate the administrative decision itself. *See id.* We uphold the agency's decision when it is supported by both the agency's actual findings and the actual reasons advanced by the agency in support of its decision. *See United Steelworkers of Am., Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984). In particular, we accept the agency's findings of fact when they are supported by substantial evidence in the record. *See Jordan Towing,* 369 Md. at 450, 800 A.2d 768. Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (citation omitted).

We uphold the agency's decision of law if it is legally correct. *See Gigeous v. Eastern Correctional Inst.,* 363 Md. 481, 496, 769 A.2d 912 (2001). "An agency is best able to discern its intent in promulgating a regulation. Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference." *Changing Point, Inc. v. Maryland Health Res. Planning Comm'n,* 87 Md.App. 150, 160, 589 A.2d 502 (1991).

### I.

### *Per Se* Exclusion Of The Test Results Under The *Accardi* Doctrine

In support of his contention that the Board erred in admitting and considering the test results, Pollock relies on *Hopkins v. Maryland Inmate Grievance Comm'n,* 40 Md.App.

329, 391 A.2d 1213 (1978). *Hopkins* followed and applied *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), which established the oft-cited rule of administrative law known as the *"Accardi* doctrine." The *Accardi* doctrine states that " '[a]n agency of the government must scrupulously observe rules, regulations or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down.' " *Hopkins,* 40 Md.App. at 335–36, 391 A.2d 1213 (quoting *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir.1969)).

"[T]here is an abundance of authority for the doctrine that an agency cannot violate its own rules and regulations." *Id.* at 336, 391 A.2d 1213. Most recently, the Court of Appeals confirmed that under Maryland law, courts will review an agency's actions "to determine if the agency complied with its regulations and required procedures." [3] *Maryland Transp. Auth. v. King,* 369 Md. 274, 286, 799 A.2d 1246 (2002). We have held specifically that the *Accardi* doctrine applies to the actions of other Maryland correctional agencies under the auspices of the Department of Public Safety and Correctional Services, including the Department of Corrections ("DOC"). *See, e.g., Smith v. State,* 140 Md.App. 445, 462, 780 A.2d 1199 (2001)(DOC "was bound by its regulation" governing eligibility of inmates for "double celling" diminution credits); *Hopkins,* 40 Md.App. at 337, 391 A.2d 1213 (Inmate Grievance Commis-

---

**3.** Interestingly, this opinion, which was filed after oral argument in this case, points out that the Court of Appeals had "not previously discussed the *Accardi* doctrine as such, or even cited *Accardi* [.]" *Maryland Transp. Auth. v. King,* 369 Md. 274, 286, 799 A.2d 1246 (2002). The Court noted in dictum that "[t]he Court of Special Appeals has recognized or applied the *Accardi* doctrine in numerous opinions[ .]" *Id.,* 369 Md. at 285, 799 A.2d 1246. Ultimately, however, the Court declined to "further explore the *Accardi* doctrine and the extent of its applicability to Maryland administrative proceedings . . . . because . . . the Maryland Transportation Authority did not violate any of its regulations." *Id.,* 369 Md. at 287, 799 A.2d 1246. *See also Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 454–55, 800 A.2d 768 (2002)(quoting *King* and stating that "[w]e have previously indicated that, generally, an administrative agency should follow its own established rules, regulations and procedures").

sion was bound by DOC regulations governing review of decision to commit inmate to solitary confinement).

If, as Pollock contends, Patuxent staff violated PID 110–18, and if the *Accardi* doctrine applies to those violations of PID 100–18, then the positive test results should have been excluded, without specifically inquiring whether the violations prejudiced Pollock. As the *King* Court noted, this Court has "taken the position that, in situations where the *Accardi* doctrine is applicable, it does not matter whether one was prejudiced by the failure of the agency to follow its procedures or regulations." *King,* 369 Md. at 286, 799 A.2d 1246 (citing *Bd. of Educ. of Baltimore County v. Ballard,* 67 Md.App. 235, 239 n. 2, 507 A.2d 192 (1986)("If [the agency] was required to strictly follow its rules, whether or not [the agency] was prejudiced by the defect is not an issue")). In that event, the *Accardi* doctrine would require the *per se* exclusion of the Friends lab reports if Patuxent staff members did not strictly comply with PID 110–18.

Patuxent acknowledges the *Accardi* doctrine and its potential impact on this case, but argues that the specific violations of PID 110–18 alleged by Pollock fall within the principal exception to the doctrine. This *"Accardi* exception" states "that the doctrine does not apply to an agency's departure from procedural rules adopted for the orderly transaction of agency business." *Hopkins,* 40 Md.App. at 336, 391 A.2d 1213. Thus, not every internal procedural policy adopted by an agency invokes the *Accardi* doctrine. *See Durham v. Fields,* 87 Md.App. 1, 18 n. 2, 588 A.2d 352, *cert. denied,* 323 Md. 308, 593 A.2d 668 (1991).

Whether the *Accardi* doctrine applies to this case is a question of law that requires us to examine the language and purpose of PID 110–18.

In determining whether an agency rule has sufficient force and effect to trigger an application of the *Accardi* doctrine, Maryland courts generally look to see whether it "affects individual rights and obligations," *See James,* 96 Md.App. at 422, 625 A.2d 361 (quoting Peter Raven–Han-

sen, *Regulatory Estoppel: When Agencies Break Their Own "Laws"*, 64 Tex. L.Rev. 1, 16 (1985)), or whether it confers "important procedural benefits upon individuals." *Board of Education of Anne Arundel County v. Barbano*, 45 Md.App. 27, 41, 411 A.2d 124 (1980).

*Anastasi v. Montgomery County*, 123 Md.App. 472, 491, 719 A.2d 980 (1998). Courts also look at "whether the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the making of the law, including the rule making procedure and publication.'" *James*, 96 Md.App. at 422, 625 A.2d 361 (citation omitted).

*Hopkins* provides an instructive illustration of a "procedural benefits" regulation that is subject to the *Accardi* doctrine because it "confers important . . . benefits upon" inmates. *See Barbano*, 45 Md.App. at 41, 411 A.2d 124. In that case, we rejected an attempt to classify a DOC regulation as a "mere aid" to the DOC's exercise of its discretion in conducting its affairs. The regulation at issue provided that an inmate confined to isolation as a result of an infraction of DOC rules "will appear before the Adjustment Team within . . . 72 hours of the alleged violation unless prevented by exceptional circumstances." *Hopkins*, 40 Md.App. at 330, 391 A.2d 1213. We held that

> [i]t is clear that [the rule] . . ., which is couched in unambiguous, mandatory language, was not intended to govern internal agency procedures but was specifically adopted to confer important procedural benefits and safeguards upon inmates, including, among other things, "minimizing the length of the period of restrictive confinement which an inmate may be forced to endure prior to an adjudication of guilt."
>
> Measured by these standards the action of the Division of Correction in departing from its own rule cannot stand.

*Id.* at 337, 391 A.2d 1213 (citation omitted).

Similarly, a prior episode in Pollock's own parole history provides another example of a Patuxent rule that is not

exempt from the *Accardi* doctrine because it "confers an important procedural safeguard" that "protect[ed] [Pollock's] individual rights[.]" In 1991, the Board sought to revoke Pollock's parole, also for alleged drug use. The circuit court held that the Board's failure to follow its own officially promulgated regulations governing parole revocation proceedings required dismissal of the revocation proceedings. In 1993, we upheld that decision, reasoning that the regulation afforded parolees significant procedural safeguards "related to the form of the hearing and the required findings of fact." *Patuxent Inst. Bd. of Review v. Pollock,* No. 1258, Sept. Term 1992, 95 Md.App. 738 (1993), slip op. at 8. We explained that "[o]ur primary concern ... is whether the time requirement in PIR 240–19(V)(D) is mandatory or directory." *Id.,* slip op. at 5.

We concluded that the regulation was mandatory, given its mandatory "shall" language. When viewed in conjunction with a specific 90 day time limit and the stated purpose of the regulation " '[t]o establish prompt hearings for the purpose of determining whether a violation of parole did in fact occur[,]' " this language indicated that the regulation conferred specific procedural rights on inmates facing parole revocation. *Id.,* slip. op. at 6. To reach that conclusion, we examined whether the rule specified the sanction for non-compliance, as well as the purpose and policy of the rule. *See id.,* slip. op. at 7. We held that Patuxent's admitted violation of its regulation governing notice of parole revocation proceedings "compel[led] a finding that the dismissal of Pollock's parole revocation charges was appropriate." *Id.*

We have reached similar conclusions in other cases in which we determined that the regulation at issue "conferred important procedural benefits" on particular individuals. In *Smith,* 140 Md.App. at 462–63, 780 A.2d 1199, we reversed the DOC's denial of diminution credits for double celling, because the DOC violated its own published regulation defining which inmates were eligible for such credits. In *Anastasi,* 123 Md.App. at 491–92, 719 A.2d 980, we reversed the denial of a police officer's grievance that the department failed to promote him, because the department violated county regulations

requiring that the employee be given notice and an opportunity to respond to harmful memos that were placed in his personnel file. In *Ballard*, 67 Md.App. at 244, 507 A.2d 192, we affirmed the reversal of a school board's termination of a school librarian, because the board violated published procedural regulations for penalizing or terminating tenured teachers.

Cases in which we have held that the administrative rule at issue fell within the *Accardi* exception provide instructive contrast. Like *Ballard*, a number of them involve violations of procedures for evaluating educators.

In *Bd. of Educ. of Anne Arundel County v. Barbano*, 45 Md.App. 27, 39–44, 411 A.2d 124 (1980), we held that, unlike Baltimore County's procedures governing discipline and termination of tenured probationary teachers, which we reviewed in *Ballard*, the State Board of Education's "Guidelines for the Evaluation of Probationary Teachers" did not confer procedural benefits on individual teachers. These guidelines had been adopted by resolution of the State Board, to compel county boards of education to adopt procedures "not inconsistent" with those set forth in that resolution. *See id.* at 30, 411 A.2d 124. The prescribed guidelines, which did not have the effect of a properly promulgated and published rule or regulation, required at least four observations of the probationary teacher each year, by more than one qualified observer, after which the observer consulted with the teacher and submitted a written report. *See id.* at 30–31, 411 A.2d 124. The lower court concluded that these "guidelines ... were meant to function in part as aids to assist probationary teachers in becoming competent[,]" and thus "were meant to confer an important procedural benefit upon probationary teachers[.]" *Id.* at 38, 411 A.2d 124.

We reversed. Although we agreed that the court's observation "[t]hat probationers are the beneficiaries carries a seed of correctness," nevertheless we explained that "the primary purpose of the State Board of Education" was "not to bestow procedural benefits upon teachers of questionable competency,

but to bestow upon students education by teachers of unquestionable competency." *Id.* at 39–40, 411 A.2d 124. Thus, "the primary purpose of the guidelines" was not to protect the individual rights of probationary teachers, but "to provide 'a system' applicable among the 23 counties" for evaluating probationary teachers. *Id.* at 44, 411 A.2d 124. We concluded that the procedural benefit to probationary teachers was merely "tangential"—"a beneficial offshoot" of the procedural guidelines, rather than the primary purpose of them. *See id.* Applying the *Accardi* exception, we held that the guidelines were "administrative rules for the orderly transaction of business[ .]" *Id.*

Similarly, in *Bd. of Sch. Comm'rs of Baltimore City v. James,* 96 Md.App. 401, 424, 625 A.2d 361, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993), we upheld the State Board of Education's determination that "Procedures for Evaluations of Teaching Staff" (the "Procedures") did not confer procedural benefits on individual teachers. In doing so, we examined several factors weighing against an interpretation of the Procedures as creating a strictly enforceable procedural benefit for teachers. Among those factors were that (1) the State Board interpreted the Procedures as being designed "to improve instruction and professional ability and *not* to confer procedural benefits[,]" (2) there was no " 'regulatory history' indicating that the Procedures were designed to confer procedural benefits[,]" (3) the title "Procedures for Evaluations of Teaching Staff" indicated that the procedures were merely " 'guidelines[,]' " (4) "the language of the Procedures . . . [was] not 'unambiguous, mandatory language[,]' " (5) the stated purpose of the teacher evaluation was "to improve instruction and to encourage growth in professional ability and responsibility on the part of staff[,]" (6) the Procedures were not explicitly "directed at" a disciplinary action against teachers, (7) the Procedures were not "officially promulgated rules," and (8) even the teachers did not view the Procedures as having the force and effect of law: *Id.* at 423–25, 625 A.2d 361. We found that the procedures in question more closely resembled

the administrative guidelines in *James* than the procedural rights in *Ballard*. *See id.* at 423–24, 625 A.2d 361.

In *Durham v. Fields*, 87 Md.App. 1, 588 A.2d 352, *cert. denied*, 323 Md. 308, 593 A.2d 668 (1991), we rejected a former college dean's complaint that his employer "failed to follow scrupulously the procedures and timetable for evaluating his performance," before terminating his employment. *See id.* at 18–19 n. 2, 588 A.2d 352. We explained that the "timetable for completing evaluations . . . . was not 'intended primarily to confer important procedural benefits upon individuals' but was instead merely for 'the orderly transaction of business.'" *Id.*

Here, after considering the relevant factors, we conclude that PID 110–18 does not "confer important procedural benefits and safeguards" upon individual Patuxent parolees such as Pollock. As set forth below, the title, stated purpose, language, and history of this directive collectively indicate that it was not primarily designed to guarantee parolees that their urine specimens will be collected and documented in precisely the manner described in the directive.

- **Title and Regulatory History:** Although the title given to a set of administrative procedures does not necessarily dictate whether it confers procedural rights or merely establishes internal agency guidelines, it may be evidence of the agency's intent. *See James,* 96 Md.App. at 423–24, 625 A.2d 361. In contrast to the "Patuxent Institution Regulation" promulgated and published to establish procedures for parole revocation, PID 110–18 is a Patuxent "directive" that is "confidential" and "restricted to [Patuxent] staff only." Thus, it is not a duly promulgated and published "regulation" with "the force and effect of law." *See id.; Barbano*, 45 Md.App. at 30, 411 A.2d 124.

- **Stated purpose and policy:** PID 110–18 states that its purpose is "[t]o provide a procedure for monitoring inmates that are or are suspected of being under the influence of intoxicants." The directive also states that "[i]t is the policy of Patuxent Institution to have a procedure to detect the use of illicit drugs by inmates . . . .

[which] presents a serious threat to the safety, security, and good order of the Institution. Urinalysis testing of inmates can be an effective means by which to detect and discipline inmate use of illicit drugs. Urinalysis testing is intended to supplement, not replace, other means by which inmate use of illicit drugs can be detected and suppressed.

These provisions indicate that Patuxent's primary purpose for this directive is to promote the use of urinalysis testing as a means of controlling drug use by inmates, not to establish a precise rubric for conducting such drug testing. To be sure, the use of the procedures described in the directive does protect the interests of the inmates as well as Patuxent, but a fair reading of the entire directive reveals that to be an incidentally "beneficial offshoot." *See Barbano,* 45 Md.App. at 44, 411 A.2d 124. That reading is consistent with the Board's interpretation of the directive, to which we give deference. *See Changing Point,* 87 Md. App. at 160, 589 A.2d 502.

- **Source of authority:** The source of authority cited for this directive is a general regulation promulgated by the Department of Public Safety and Correctional Services, which states that "[a] parolee shall give a random urine specimen as required by the parolee's supervisor." COMAR 12.12.08.09.G (2002). This regulation does not itself confer any procedural benefit on inmates; thus, Patuxent was not obligated to adopt a directive that did so.

- **Language of the rule:** Although the directive provides that "[t]he urine specimen shall be collected from the inmate as follows" and that "[t]he urine specimen shall be handled and processed as follows," the use of the term "shall" is not necessarily mandatory.

[I]n Maryland, use of the word 'shall' is ordinarily presumed to be mandatory, although use of the word "shall" is, on occasion, "interpreted as directory and not mandatory." In endeavoring to ascertain the intent ... in using the word "shall", we begin by considering the absence of a sanction in the [rule].

*G & M Ross Enter., Inc. v. Bd. of License Comm'rs of Howard County,* 111 Md.App. 540, 543, 682 A.2d 1190 (1996). Here, other language in the directive suggests that it was designed to be a set of internal rules for "good practices" in Patuxent's urinalysis testing program. For example, in one important provision, regarding "handling and processing" of specimens, the directive uses "shall" and "should" interchangeably. It states that "[t]he number of staff handling the specimen should be minimized," and that "[a]t all times, the specimen should be in the actual possession and control of staff or secured in a manner which does not compromise the integrity of the chain of custody," but also that "[a]ll items shall then be placed in the refrigerator in the Major's area." PID 110–18.V1.A.5.a. Moreover, the lack of any established sanction for violating the procedures in the directive also indicates that they were intended to be "directory, rather than mandatory." *G & M Ross Enter.,* 111 Md.App. at 545, 682 A.2d 1190.

Together, these factors persuade us that PID 110–18 does not confer procedural rights upon Pollock, but instead merely provides for the orderly transaction of Patuxent business.

That conclusion does not end our inquiry. An agency does not have *carte blanche* to violate its own procedural policy merely because it is not subject to the *Accardi* doctrine. An agency's failure to follow its "internal administrative procedures" may require reversal of the agency's action if "the complaining party can show substantial prejudice." *James,* 96 Md.App. at 421, 625 A.2d 361. Thus, "even if an agency rule does not have the force and effect of law (that is, even if it is simply interpretive, a statement of policy, or any other, lesser, rule of agency organization, procedure, or practice), a violation of that rule will still invalidate an agency's action if the complainant can show that he was substantially prejudiced by the violation." *Anastasi,* 123 Md.App. at 491 n. 8, 719 A.2d 980.

The question of whether Pollock was substantially prejudiced by any violation of PID 110–18 dovetails with the

remaining question raised by Pollock's appeal: whether the Board and the circuit court erred in concluding that the test results provided valid and sufficient grounds for revoking and then not renewing Pollock's parole. We shall address both questions by examining each of Pollock's specific complaints about violations of PID 110–18.

## II.

### Alleged Violations Requiring Exclusion Of Test Results

#### A.

#### "Numbers Problems"

PID 110–80.VI.A.4.c states that "staff shall hand to the inmate the specimen bottle, pre-labeled with the inmate's name, number, and date[,]" and that "[t]he inmate shall be asked to acknowledge that information on the label is correct[.]" It is undisputed that although Pollock's inmate number is **4695,** the Request for Urinalysis Test form and the Incident Report identified Pollock's specimen by number **4697;** that the Laboratory Testing Requisition Form identified the specimen by number **4669;** and that Friends' test results from the initial test used the **4669** number to identify Pollock's specimen. It is also undisputed that all of the Patuxent and Friends documents specifically identified the sample by Pollock's correct first [4] and last names.

The circuit court found generally that Patuxent "complied with" PID 110–18 and that there was " 'substantial evidence' in support of the conclusion that the sample submitted by Mr. Pollock contained marijuana," without specifically discussing whether Patuxent staff properly labeled Pollock's specimen. Pollock complains that "the Board's finding that the samples were one and the same was clearly erroneous," because "the number assigned to the urine sample obtained from [him] at Patuxent was not documented in either the Request for Urinalysis Test form, or in the Incident Report." He points out

---

4. On two forms, Pollock's first name was misspelled as "Micheal."

that the number listed on these two required forms was **4697**, which differed not only from Pollock's inmate number (**4695**), but also from the number on the test reports prepared by Friends (**4669**). Moreover, Pollock contends, there is no evidence that **any** number was placed on the specimen itself. Given this evidence of the non-existence, incorrectness, and/or inconsistency of the numbers on Pollock's specimen and the Patuxent forms, Pollock asserts, the evidence was not sufficient to support the Board's finding that the specimen that tested positive was the one that he submitted.

Citing the testimony of Sgt. Jones and the three documents prepared at the time Pollock submitted his specimen, the Board responds that "the specimen and the laboratory result were correctly and unambiguously identified by Pollock's name," which was sufficient to identify the positive specimen as belonging to Pollock. It points out, in particular, that Pollock's name was not similar to the name of any other of the six inmates whose specimens went to Friends for testing along with Pollock's.[5] The Board acknowledges that the numeric labeling requirement in the directive promotes correct identification of the specimen and the lab results by earmarking each specimen with more than one identifier. Nevertheless, Patuxent argues, the numeric identification was an "unnecessary" redundancy in Pollock's case given that there was other evidence that was sufficient to establish the "accurate and unambiguous identification of Pollock's specimen." It analogizes the incorrect inmate numbers used in this case to other "minor clerical errors" such as a minor misspelling of an inmate's name. In either case, it asserts, as long as it can be determined from all of the circumstances that there was little possibility of confusion of identity, such minor errors do not warrant suppression of the test results. *See, e.g., Foust v. Goord,* 262 A.D.2d 904, 694 N.Y.S.2d 489, 490 (1999)(minor

---

**5.** The other names and inmate numbers on the "Laboratory Requisition Test Form" were "James Gregory # 9010," "Michael Figgs # 8993," "Benny Brown # 2860," "Guy Marshall # 2957," "Charles Gillespie # 5352," and "Fernando Stuart # 4011."

spelling errors on inmate urinalysis testing forms did not invalidate positive test results).

A correctional agency attempting to offer urinalysis test results as grounds for revoking parole "must establish the chain of custody—that is a basic step in authenticating the evidence prior to its admission." *McDonald v. State,* 314 Md. 271, 281, 550 A.2d 696 (1988). We agree with Patuxent that, in this case, there was substantial evidence to support the Board's "chain of custody finding" that it was Pollock's specimen that tested positive for cannabis on May 17 and 23, 1997, and thus, that Pollock was not prejudiced by the use of numbers other than his correct inmate number to identify his specimen.

Here, we find it significant that the "Laboratory Testing Requisition Form," which was the only document that Patuxent sent to Friends along with Pollock's specimen, shows that (1) Pollock's name is not similar to the name of any other inmate whose specimen was sent for testing at the same time as Pollock's; (2) the "specimen identity" number listed on the manuscript line directly above Pollock's signature was "4669;" (3) Friends used the same number to identify Pollock's specimen in its May 16 report of the positive test results. In these circumstances, the Board did not act arbitrarily or capriciously in concluding that Pollock acknowledged that the specimen he gave on May 15, 1997 was marked with both his name and 4669, albeit that number was not his inmate number.

We conclude that the use of an identification number other than Pollock's inmate number on the specimen label does not automatically void the test results, even if it was not "the inmate's . . . number[.]" Because the name and number identifiers on the Laboratory Testing Requisition Form were acknowledged by Pollock and matched the ones that Friends used in its May 16, 1997 report of the positive test results, there was sufficient evidence to satisfy the test for establishing chain of custody—that "there exists the 'reasonable probability that no tampering occurred.'" *Hawkins v. State,* 77 Md.App. 338, 347, 550 A.2d 416 (1988).

We hold that the evidence was sufficient to support the Board's finding that the positive specimen reported by Friends belonged to Pollock. *Ipso facto*, Pollock was not "substantially prejudiced" by the failure of Patuxent staff to use Pollock's correct inmate number on these forms.[6]

## B.

### Evidence Tape

Pollock's second complaint against the Patuxent staff is that they violated the requirement that the officer taking custody of the urine specimen "secure a piece of Evidence Tape over the cap," as prescribed in PID 110–18.VI.A.4.d. In support, Pollock cites Sgt. Jones' testimony at the parole revocation hearing, admitting that Pollock "sealed the bottle himself. He put the top on and sealed it himself and handed it to me[.]"

Patuxent counters with two presumptions. First, it relies on the presumption that, in the absence of contradictory evidence, public officers properly perform their duties. *See Lerch v. Maryland Port Auth.*, 240 Md. 438, 457, 214 A.2d 761 (1965). Second, it contends that, even if these duties are not carried out properly, there is still a presumption that there is a "reasonable probability that no tampering occurred." *Hawkins*, 77 Md.App. at 347, 550 A.2d 416.

We do not find the first presumption applicable in this case, because not only is there "contradictory evidence" that the custody officers did not secure the evidence tape on Pollock's specimen bottle, but that evidence consisted of an unrebutted admission by Sgt. Jones. Instead, we are persuaded that

---

6. In reaching this decision, however, we do not agree with the Board's broad assertion that the use of incorrect inmate numbers to identify a specimen always can be disregarded as an "unnecessary redundancy" or a "minor clerical error." Numerical errors may not be so easily recognized as spelling errors, nor as benign as in this case. In another case, in which the incorrect inmate number. raises a reasonable doubt as to the identity of the positive specimen, such an error could be reason to exclude the test results.

Jones' unrebutted testimony strongly supported the second presumption. Jones' testimony that he allowed Pollock to secure the evidence tape while he watched may have established that Jones failed to strictly comply with the procedures in the directive, but it also established a reasonable probability that no tampering occurred at that stage of the collection process.

## C.

### Missing Signature On Chain Of Custody Form

The third instance of non-compliance that, according to Pollock, requires exclusion of the urinalysis test results is that Patuxent's chain of custody document failed to reflect that Pollock's specimen was handled by C.O. Taylor as well as Sgt. Jones. He points to the portion of the required "Request for Urinalysis Test" form stating that the specimen went "[f]rom above-named inmate [t]o APJones," then "[f]rom APJones to lock[ed] refrigerator," even though Jones testified at the revocation hearing that after Pollock handed him the sealed specimen, he "handed it to Officer James Taylor to put in the locked refrigerator" while Jones and Pollock were there. Neither Taylor's name nor his signature appear in the chain of custody portion of the form.

In response, the Board relies on *Martin v. State*, 78 Md. App. 541, 545, 554 A.2d 429, *cert. denied*, 316 Md. 428, 559 A.2d 790 (1989), in which we distinguished "bare possession" from "custody" in concluding that a state trooper had only "bare possession" of evidence when he did nothing but hand an item of evidence to another state trooper. Accordingly, the fact that the chain of custody form did not reflect the trooper's "bare custody" did not require exclusion of the evidence. We agree with the Board that Taylor's fleeting contact with Pollock's specimen was "bare possession," and that the test results cannot be excluded on the ground that Taylor's name does not appear in the chain of custody portion of the Patuxent form.

### D.

### Missing Medical Laboratory Chain of Custody Form

 Pollock's final item of "non-compliance" concerns the failure of the Patuxent staff to produce a copy of the Medical Laboratory Chain of Custody Form. PID 110–18.VI.A.4.g., which Pollock relies on, states that "[t]he original copy of the Medical Laboratory Chain of Custody Form shall be retained until the specimens are picked up for testing. The original copy shall be signed by and released to the Medical Laboratory courier. The duplicate copy shall be sent to the Major's Office." Pollock complains that Sgt. Jones did not testify that the form was actually completed or that a copy of the form was sent to the Major's office.

Patuxent contends, and we agree, that, given the testimony of the officers, the Laboratory Testing Requisition form that is signed by Pollock, and the Request for Urinalysis Test form, no additional evidence was necessary to establish the chain of custody in this case. *See, e.g.,* Md.Code (1984, 1999 Repl.Vol.) § 10–213(d)(4) of the State Government Article (officer presiding over a contested administrative case may exclude unduly repetitious evidence). Contrary to Pollock's contention, the directive does not require that the copy of the form sent to the "Major's Office" must be produced to establish a chain of custody.

### Conclusion

There is enough evidence in this administrative record to support the Board's finding that the positive urine specimen belonged to Pollock. Because the Board's decision was supported by substantial evidence that Pollock violated his parole by using marijuana, including the positive urinalysis test results, and it committed no error of law, we must affirm its decision. *See Baltimore County Licensed Beverage Ass'n, Inc. v. Kwon,* 135 Md.App. 178, 186–87, 761 A.2d 1027 (2000).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**